UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JTH TAX LLC, d/b/a LIBERTY TAX
SERVICE,

                              Plaintiff,              **MEMORANDUM & ORDER**
                                                        22-CV-2385 (PKC) (CLP)

          - against -

ALEXIA AGNANT and DEMETRESS
CORPORATION,

                              Defendants.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

Before the Court is the motion of JTH Tax LLC, d/b/a/ Liberty Tax Service ("Liberty Tax")

for a preliminary injunction against Alexia Agnant and Demetress Corporation ("Demetress").  On

May 2, 2022, the Court issued a temporary restraining order (*see* 5/2/2022 Docket Order; Order

Granting Motion for Temporary Restraining Order ("TRO Order"), Dkt. 8), and on May 13, 2022,

the Court held a show-cause hearing (*see* 5/13/2022 Minute Entry).  At the show-cause hearing,

the Court reserved ruling on Liberty Tax's motion for a preliminary injunction and directed the

parties to file supplemental documents that were referenced during the hearing by May 14, 2022.

(*See* 5/13/2022 Minute Entry; 5/13/2022 Docket Order).  For the reasons stated herein, Liberty

Tax's motion is denied.

## BACKGROUND

### I.    Findings of Fact

Pursuant to Federal Rule of Civil Procedure 52(a)(2), the Court makes the following

findings of fact in support of its denial of a preliminary injunction against Agnant and Demetress.[1]

---

[1] The Court's findings are largely based on evidence and argument presented at the May 13, 2022, show-cause hearing.  Because an official transcript of the hearing is not yet available,

The Court also incorporates by reference its May 2, 2022 Docket Order granting Liberty Tax's motion for a temporary restraining order.  (*See* 5/2/2022 Docket Order; TRO  Orde, Dkt. 8.)

### A.      The Franchise Agreements

Liberty Tax is a franchisor of income tax preparation services in the United States.  (*See* Liberty Tax Complaint ("Liberty Tax Compl."), Dkt. 1, ¶¶ 9, 12.) [2]  On or about November 1, 2019, Liberty Tax and Agnant entered into three franchising agreements to establish Liberty Tax franchise stores in Brooklyn, New York (collectively, "Franchise Agreements").  (*Id.* ¶ 15.)  On December 31, 2019, Agnant purchased four existing Liberty Tax locations[3] (*see* Agnant and Demetress Complaint Filed In Docket No. 22-CV-2352 ("Agnant Compl."), Dkt. 14-1, Ex. 1, ¶¶ 21, 23), and started operating those stores pursuant to the Franchise Agreements (Liberty Tax Compl., Dkt. 1, ¶ 28).  On April 6, 2020, the Franchise Agreements were transferred to Agnant and Demetress, a New York corporation owned and operated by Agnant.  (*See* Liberty Tax Compl., Dkt. 1, ¶¶ 3, 4, 16; Agnant Compl., Dkt. 14-1, Ex. 1, ¶ 6.)

### B.      The Department of Justice Investigation and Settlement

Prior to the parties' entry into the Franchise Agreements, Liberty Tax was being investigated by the Internal Revenue Service ("IRS") and the Department of Justice ("DOJ") in connection with the preparation and transmission of false or fraudulent tax returns by its franchisees.  (*See* DOJ Complaint Against Liberty Tax, Dkt. 14-2, Ex. A, at 1 and ¶¶ 32, 34(C),

---

the Court refers to evidence, arguments, and representations made at the show-cause hearing without citation.

[2] As discussed *infra*, Agnant and Demetress filed a separate complaint against Liberty Tax and the Court consolidated the parties' dueling cases and designated this case as the lead case. (*See* 5/5/2022 Docket Order.)  All citations are to this docket.

[3] At the show-cause hearing, Agnant testified to purchasing these locations from another franchisee who is not a party to these consolidated actions.

(D).)  One of the issues identified by the DOJ's investigation was Liberty Tax franchisees'

preparation and transmission of income tax returns earned by self-employed "individuals who do

business as sole proprietorships, which taxpayers report on Schedule C on Form 1040 federal

income tax returns ('Schedule C Income')." (*Id.* ¶ 16(B).)  "Unlike W-2 Income, the IRS does not

receive independent verification from an employer of the existence and amount of a taxpayer's

Schedule C Income" and thus "the accuracy of Schedule C Income . . . reported on a federal income

tax return used to claim the [earned income tax credit ('EITC')] depends upon the taxpayer and

his/her tax return preparer."  (*Id.* ¶ 17.)

Among other things, the DOJ's investigation determined that Liberty Tax franchisees (1)

reported Schedule C Income "for businesses that did not exist"; (2) reported "inflated Schedule C

Income for customers who had Schedule C businesses in order to increase the amount of the

claimed EITC"; (3)  ignored "earned income due diligence requirements by . . . otherwise failing

to make reasonable inquiries as to whether the Schedule C Income as well as Schedule C expenses

reported on the tax return were accurate or existed"; and (4) "[c]ompleting blank forms provided

by Liberty Tax with false information to include in customer files to give the appearance that

preparers interviewed customers to reconstruct Schedule C Income when customers lacked

business records."  (*Id.* ¶ 21.)  The DOJ's investigation also alleged that "Liberty Tax had notice

(or should have had notice) of EITC fraud involving Schedule C . . . at Liberty Tax Service

franchise locations, but failed to take adequate measures to stop the practice."  (*Id.* ¶ 2; *see also* ¶

23(C) ("In early January 2014, Liberty Tax, including its CEO at the time, John T. Hewitt, received

complaints that franchisees had prepared tax returns with potentially false . . . EITC claims. Despite

these complaints, the number of e-filed tax returns transmitted to the IRS by Liberty Tax claiming

HSH Income [defined as wages earned from household work] rose and the problem continued

3

throughout the 2014 and later tax seasons."); ¶ 33 ("Liberty Tax, however, failed to take sufficient measures to prevent fraud and errors on tax returns prepared at its stores.").)

As a result of this investigation, on December 3, 2019, the DOJ commenced an action against Liberty Tax in the United States District Court for the Eastern District of Virginia (*see generally id.*) for the purpose of entering into a consent decree.  On December 20, 2019, the court so ordered the consent decree.  (Agnant Compl., Dkt. 14-1, Ex. 1, ¶ 10.)  The consent decree requires Liberty Tax to maintain a rigorous internal review system to address issues like fraudulent Schedule C filings.  (*See* Dkt. 14-2, Ex. B, §§ VII–XI.)  It also requires Liberty Tax to distribute a notification attached to the consent decree within 15 days to every then-existing franchise owner and, for 60 months following entry of the consent decree, to any individuals or entities that become new Liberty Tax franchisees *prior* to execution of the franchise agreement.  (*Id.* § XIII(A).)  The notification provides that tax return preparers are legally required to ensure against the filing of any inaccurate, false, or fraudulent federal tax returns, and that violations of laws or rules by the preparers would result in reports to the IRS.  (*Id.* at ECF 102.)  Additionally, Liberty Tax was required to disclose, for 60 months following entry of the consent decree, to prospective purchasers prior to any sale closing, information regarding any false or fraudulent federal tax returns, or other violations of federal tax laws or regulations at locations and/or territories they were considering purchasing.  (*Id.* § XIII(B).)

The parties dispute whether Liberty Tax disclosed the DOJ investigation to Agnant prior to her entry into the Franchise Agreements.  Liberty argues that it provided Agnant with a complete copy of its Franchise Disclosure Agreement ("FDD"), issued on July 1, 2019, before the parties entered into the Franchise Agreements.  (*See* Liberty Tax Reply, Dkt. 15, at 4–5.)  Liberty Tax further argues that Agnant acknowledged receipt of the FDD on August 2, 2019.  (*Id.*)  At the

4

show-cause hearing, Liberty Tax introduced parts of the July 2019 FDD that it alleges was transmitted to Agnant and her receipt acknowledgement of the same. (*See* Liberty Tax's Exhibit 2; *see also* Dkts. 15-2, 15-3.) In its supplemental evidentiary submission, Liberty Tax provides the Court with a 435-page document it alleges is the complete FDD provided to Agnant before the parties entered into the Franchise Agreements. (*See* Dkts. 16-1, 16-3.)

Agnant, on the other hand, testified at the show-cause hearing that she only received a partial FDD in 2019, which did not disclose anything about the DOJ investigation, and that she signed the acknowledgment of receipt of the FDD on August 2, 2019, without the requisite disclosure about the DOJ investigation by Liberty Tax. Agnant further testified that she did not receive the full FDD until March 2021—approximately seventeen months after the parties had entered into the Franchise Agreements. As part of her supplemental evidentiary submission, Agnant provides a 111-page document she alleges she received in August 2019, which did not include all the pages of the FDD introduced at the show-cause hearing or any disclosure about the DOJ investigation of Liberty Tax. (*See* Dkt. 17-3 (erroneously labelled "Exhibit 2")).[4]

---

[4] In addition, Agnant provides the FDD that she alleges she received, for the first time, in March 2021. (*See* Dkt. 17-1.) However, this FDD contains various references suggesting that while the FDD was issued on March 17, 2021, it was later "amended [on] August 30, 2021." (*See, e.g.*, *id.* at ECF 4 ("ECF" refers to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination).) The reference to the August 2021 amendment in the FDD submitted by Agnant indicates that she could have not received it in March 2021 (at least not for the first time), as she claims, but rather, likely received it in October 2021. (*Id.* at ECF 2.) Agnant also is unable to provide any documentation as to when she acknowledged receipt of the FDD she submitted. (Dkt. 17, at 1 (explaining that when Agnant "attempted to pull the DocuSign certificate, she received an error message which said the document was 'suspended['] and to 'contact the sender.'").) In any event, the Court does not rely on this exhibit in making its findings or rulings on the preliminary injunction motion.

At this stage of the case, without the benefit of discovery, the Court cannot determine, even by a preponderance, whether Liberty Tax did, or did not, provide Agnant with the full FDD before the parties entered into the Franchise Agreements.[5]

However, even assuming that Agnant did receive the complete FDD before November 1, 2019, the Court notes that the FDD is at least 435 pages long[6] and contains only two brief, non-highlighted references to the DOJ investigation, which do not describe the extent or nature of the investigation and Liberty Tax's alleged misconduct.  (*See* Dkt. 16-1, at ECF 9 ("The IRS and [DOJ] are conducting an investigation of [Liberty Tax's] policies, practices and procedures in connection with its tax return preparation activities. Separately, we are aware that the IRS and DOJ are conducting investigations and pursuing actions against certain of our former franchisees and area developers."); *id.* at ECF 407 ("The DOJ has been conducting an investigation of the Company's policies, practices and procedures in connection with its tax return preparation activities. . . . From time to time, certain of [Liberty Tax]'s franchisees and [Liberty Tax]-owned offices are the subject of IRS investigations to review their tax return preparation activities, and in certain cases the DOJ has sought injunctions and other remedies with respect to some of the [Liberty Tax's] former franchisees . . . .").)  Additionally, Liberty Tax does not dispute that it failed

---

[5] Liberty Tax argues that "even if Agnant did not receive notice of the DOJ investigation . . . [her] fraudulent inducement claim still fails because the underlying civil enforcement actions that gave rise to the DOJ [c]omplaint are public documents that could have been discovered by the exercise of ordinary diligence."  (Liberty Tax Reply, Dkt. 15, at 5 (internal citations omitted).) The Court need not resolve this issue at this stage because, as discussed in more detail below, its decision on Liberty Tax's motion for a preliminary injunction is not based on Agnant and Demetress's recission argument.

[6] While the FDD submitted by Liberty Tax, which is dated July 1, 2019, is 435 pages long (*see* Dkts. 16-1, 16-3), the FDD submitted by Agnant, which is dated March 17, 2021, as amended August 30, 2021, is 627 pages long (*see* Dkt. 17-1).  The Court assumes that the difference in length reflects amendments Liberty Tax made to the FDD between July 2019 and August 2021, but neither party has sought to explain the difference.

6

to notify Agnant about the DOJ lawsuit and consent decree that was entered in December 2019, before Agnant bought the four franchise locations from another franchisee.  Neither does Liberty Tax dispute that, while Liberty Tax was not a party to that purchase and sale agreement, as the franchisor, it has control over sales between franchisees and it approved the sale to Agnant—as Agnant testified at the show-cause hearing.[7]

### C.    Compliance Reviews and Agnant's Attempts to Cure Issues

On July 22, 2021, Liberty Tax conducted a compliance review of one of the franchised locations owned by Agnant and based on that review, issued a notice to cure to Agnant on September 1, 2021, in part for failure to obtain supporting information including, when necessary, documents for Schedule C Income tax filings with .  (*See* Agnant Compl., Dkt. 14-1, Ex. 1, ¶ 27; Dkt. 17-4, at ECF 20–21.)  To address the notice, Liberty Tax required Agnant "to develop a Remediation Plan" to ensure compliance with Schedule C filing requirements at all four locations. (*See* Dkt. 17-4, at ECF 22.)  Additionally, "all [future] Schedule C returns prepared in" that location were "held pending a compliance review."  (*Id.* at ECF 17.)  As Agnant testified to at the hearing, and as the records filed by Agnant reflect, Agnant promptly responded to the notice to cure, created a remediation plan as required, completed training, and submitted requested documents to Liberty Tax.  (*Id.* at ECF 22–25.)  While addressing the notice to cure, Agnant repeatedly asked Liberty Tax's compliance department, which issued the notice to cure, for a call to discuss the issues.  (*Id.* at ECF 22–24.)  Records provided to the Court reflect that Agnant finally spoke with Jessica Huard at Liberty Tax before Liberty Tax found that "[a]ll requirements of this issue ha[d] been met," and the "issue" was closed on September 15, 2019.  (*Id.* at ECF 24.)

---

[7] Agnant's testimony is corroborated by the Franchise Agreements, which provide that any transfers of ownership in the franchises must be approved by Liberty Tax in writing.  (*See* Dkt. 1-6, § 15(a).)

On December 22, 2021, Liberty Tax advised Agnant regarding certain compliance requirements "for th[e] upcoming tax season." (*Id.* at ECF 11–12 ("Based on the results of testing conducted in your office(s), the complete client file, including office review documents, will need to be uploaded into Fusion for all returns prepared in office(s) 11190 and 15647 prior to submission. . . . Additionally, in keeping with your remediation plan requirement for your office(s) . . . to have someone other than the person who prepared a return review it prior submission, the tax preparer listed on a return will not be able to complete the submission process.").)[8] Liberty Tax also advised Agnant that "[f]or every Schedule C return submitted in" one of the locations, Liberty Tax's compliance team would "review the return before it can be submitted to the IRS." (*Id.* at ECF 13.) Records of communications between Agnant and Liberty Tax's compliance department indicate that Agnant did not understand what was required of her to be in compliance with Schedule C and other requirements. Agnant pleaded with the compliance department for clear explanations on how to comply, and requested training, but was often met with generic, non-substantive answers and referrals to other departments. For example, on December 22, 2021, Agnant wrote, in part:

> Also [the due diligence portion of] the program has recently changed . . . when it comes to schedule c . . . [w]e have no idea and no clarity on how to use this and execute what is needed from compliance .in fact the new program conflicts with what you guys have requested . We have reached out to the tec support department as well as the tax department they both said they have no idea how to use or execute what is needed in the program . They were not even aware there were recent changes . Can you guys train us on how to use this because it directly correlates with what you guys are requiring from us . Please call me[.]

(*Id.* at ECF 12.) Jessica Huard responded, in part:

> Training materials are expected to be forthcoming on this, but we felt it was important to ensure you were aware of this requirement while this training was being

---

[8] The Court has not corrected or noted misspellings, or grammatical and typographical errors, from the parties' communications.

assembled by Operations. In the meantime we have provided links to . . . articles on this requirement above. If you have additional questions on how to best implement this requirement, please reach out to your Operations support team. In regards to the changes to due diligence questions in the tax software, Compliance was just provided with these changes and we do not have any training materials we created that reference them. Perhaps the training department has something available to address these changes. Operations should be able to assist you further with these items. We are forwarding this issue to them at this time.

(*Id.* at ECF 12–13.)  Because Huard's response did not provide clarity as to how Schedule C

Income compliance was to be executed, Agnant followed-up with another message:

> What returns do you need us to up load ? Schedule c ?or you also need all the free returns we complete for the senior citizens as well ? Please specify . . . .  Also I need actual help on what you are looking for and not articles. They are of no help because we are apparently still making the same mistakes.Please escalate this . I need to speak with the head of this department to advise me on how to execute what you are asking for in the program that was provided by liberty (fusion) operations and the training department has no idea on how to use this program either I have asked they are not aware on even how to use fusion this program directly affects compliance . Please Assist or escalate[.]

(*Id.* at ECF 13.)  Huard responded with:

> Every return you complete in offices 11190 and 15647 will require you to upload the complete client file. There is not a list of specific returns or items. This requirement applies to all returns and all documents in offices 11190 and 15647. For every Schedule C return submitted in office 15647 Compliance will review the return before it can be submitted to the IRS. This requirement will remain in place until there is a consistently demonstrated ability to submit Schedule Cs that meet review requirements. We will periodically evaluate the status for this but cannot give a set time period as this is based on the office submissions. Please note, this requirement is meant to assist in helping you understand the support requirements. This is the best training tool we have available, and if the materials you have previously been given did not assist you, this will. In regards to the need for additional assistance, we will allow your Operations team to respond.

(*Id.* at ECF 13–14.)  As this response again did not explain what Agnant was required to do to

comply, Agnant responded with a brief message: "I do not understand what is required of me .

please call me."  (*Id.* at ECF 14.)  On December 30, 2021, Randy Galley at Liberty Tax asked

Agnant if someone had helped explain the process, to which Agnant responded with more

questions and confusion, and she reiterated that the responses she had received so far were generic and not helpful.  (*Id.* ("WE SUBMITTED THE SAME RETURN 7 TIMES TO COMPLINACE THAT WAS LATER REJECTED BY YOU GUYS . . . THEY WERE NOT HELPFULL IN SAYING WHAT WAS NEEDED . THEY JUST HAD GENERIC RESPONCE .PLEASE CALL ME . . . SO WE KNOW EHAT TO DO OR ESCALATE THIS TO SOMEONE WHO CAN HELP." (first ellipses in original)).)  On January 25,  2022, Galley wrote to Agnant: "I believe you have the process down now."  (*Id.*)  Agnant did not respond to this message but testified at the show-cause hearing that she did not receive clear answers to her questions on how to comply with Liberty Tax's requirements.  The Court does not have further messages regarding the December 2021 "issue" and cannot determine if Liberty Tax eventually found that "[a]ll requirements of this issue ha[d] been met" and that the "issue" was closed, as had occurred with the September 2021 "issue."  (*See id.* at ECF 24.)  The Court notes, however, that the "status" notation for this chain of communications is marked as "Closed – Pending."  (*Id.* at ECF 11.)

On February 21, 2022, Huard advised Agnant that based on the results of "a review of uploaded support," Agnant was required to take a 2021 dependent review course and a 2021 "Common Schedule C Errors" training.  (*Id.* at ECF 2.)  Huard provided Agnant with what Huard referred to as "Client File Reconciliation," which required Agnant to contact taxpayers whose returns had "insufficient documentation" to "obtain the additional documentation or suggest that the taxpayer file an amended return" by March 7, 2022.  (*Id.* at ECF 3.)  Huard advised that "[i]f the outstanding document section of the Client File Reconciliation is not addressed by 3/7/22, we will be required to report these returns to the monitor[9] and DOJ."  (*Id.*)  Agnant completed the

---

[9] Pursuant to the consent decree, Liberty Tax was required to engage an independent monitor to, in part, "prevent the transmission of false or fraudulent tax returns by [Liberty Tax] to

requested training on the same day and asked for a call to understand what "[was] needed." (*Id.*) Huard responded with a message, more detailed this time, advising Agnant regarding the steps she needed to take in order to review the flagged returns[10] and pointing Agnant to "reviewer notes" if she had questions for "some clarification on any deficiencies observed." (*Id.* at ECF 4.) Agnant asked a follow-up question, but promptly informed Huard that client files would be updated. (*Id.* at ECF 5.) At the show-cause hearing, Agnant explained that she and her team did their best to provide Liberty Tax with all required documents and that sometimes the documents simply did not exist or could not be obtained in time—for example, Schedule C Income filings required school letters but, due to the global COVID-19 pandemic, children were being home-schooled and schools were closed.

Three days after the first notice, on February 24, 2022, Agnant received another notice to cure for failure to obtain supporting information including, when necessary, documents for Schedule C Income. (*Id.*) She also received a notice of default for failure to implement the required remediation plan and perform due diligence. (*Id.*) It appears that the notice of default was based on Agnant's tax preparers' failure "to complete additional Schedule C training" and to have "every return prepared . . . reviewed by someone other than the tax preparer prior to submission." (*Id.* at ECF 6.) Agnant again responded with a request for a call and with questions:

---

the IRS, and" to review and evaluate its "compliance with the terms of" the consent decree. (*See* Dkt. 14-2, Ex. B, § VII.)

[10] The steps, while not substantive answers to what Agnant needed to provide, advised her regarding the process: "1. Contact the client to address outstanding requirements"; "2. Track communication by documenting the date(s) contact was made or attempted"; "3. If return is amended, document date of amendment"; "4. If return is unsubstantiated or found to have fraudulent or abusive claims, report client [or preparer] using IRS" forms; "5. List documentation received"; "6. Attach the completed worksheet and copies of all documentation received to the issue by 3/7/2022"; and "7. If there are no outstanding requirements . . . , no further action is required." (*Id.* at ECF 4.)

"My staff and I put in multiple issue ticket asking them what to do and what they wanted . . . we have been nothing but compliant . We have no way of speaking with you or anyone in the department. . . . Can you explain what you mean by we are in default. . . . what does that mean for me . Please call me." (*Id.*)  Agnant then followed up with another message advising Huard that her staff had completed the training.  (*Id.*)  When she did not receive a response from Huard, Agnant followed up on March 2, 2022, with questions, to which Huard responded asking "[w]hat ticket" Agnant was "referring to" and advised that, "[a]s part of [the] remediation requirements, reviewers . . . [were] required to review returns and document their reviews using the Tax Return Review Checklist before returns are submitted" and that "any insufficiencies in support documents or errors observed during the review must be addressed prior to the return being submitted." (*Id.* at ECF 7.)  As with the prior "issue," the Court does not have further messages from this exchange and cannot determine whether the "issue" was closed at some point.  (*See id.* at ECF 24.)  The Court notes, however, that the "status" notation for this chain of communications is marked as "Waiting On Customer." (*Id.* at ECF 2.)

### D. Termination of the Franchise Agreements

Liberty Tax conducted audits of two of Agnant's stores and found compliance error rates of 50% for 2021 and 41% for 2022 based on a review of 30 sample returns each time.  (*See* Dkt. 18-1, at ECF 1.)  Upon additional review, one of the stores was identified as having a 57% error rate.  (*Id.* at ECF 2.)  The audit report, issued on February 16, 2022,[11] recommended that Agnant's Franchise Agreements "be terminated as soon as possible."  (*Id.* ("Based upon: [(1)] Our review

---

[11] While the audit report does not have a clear header that identifies the date it was issued and/or amended, the bottom right corner of each page is dated February 16, 2022.  (*See* Dkt. 18-1, at ECF 1–2.)  Ultimately, the exact date of the report is immaterial for purposes of the current motion.

of 30 returns from 2022 that showed minimal improvement even after compliance review completed [and (2)] Extra 30 returns reviewed from office 11190 that had an overall fail rate of 57% and unacceptable return ratings[,] [t]he Franchisee should be terminated as soon as possible.").)  Despite the issues Liberty Tax identified with Agnant's Schedule C Income filings, Agnant testified that Liberty Tax filed these returns with the IRS and the IRS accepted them. Agnant also testified that the results of the audits (or compliance reviews) could vary depending on the auditor—specifically, an auditor or reviewer once advised her that certain things that would be flagged by one auditor may not be flagged by another, and that the flagged issues would be "little things."  Agnant further testified that she repeatedly tried to call Liberty Tax's compliance department with questions, but was always met with generic, non-substantive answers that did not provide her with guidance on how to comply with Liberty Tax's requirements.

On March 12, 2022, Liberty Tax advised Agnant that, effective immediately, the Franchise Agreements were terminated pursuant to paragraph 8.b(iii) of the Franchise Agreements.  (*See* Dkt. 1-9, at ECF 1.)  Liberty Tax further advised Agnant that she, or those acting under her supervision and control, had "committed a material violation of law, ordinance, rule or regulation of a governmental agency or department reasonably associated with the operation of the Franchised Business, or committed an act that is or could be, in Liberty's determination, harmful prejudicial or injurious to the Liberty brand."[12]  (*Id.*)  Following the notice of termination, Agnant and Demetress continued to operate at the same franchised locations and use the same phone

---

[12] Paragraph 8.b(iii) of the Franchise Agreement provides that Liberty Tax can terminate the Franchise Agreements without notice and opportunity to cure if, among other things, Liberty Tax determined that Agnant or Demetress (and those acting under their supervision and control) had committed a material violation of any law associated with the operation of the franchised business or "any act that is or could be, in Liberty's determination, harmful, prejudicial or injurious" to Liberty Tax's brand.  (*See* Dkt. 1-6, ¶ 8.b(iii).)

numbers as before, but they eventually changed their signage, marks, and website to "Rocket Tax." Agnant testified at the show-cause hearing that, due to the cyclical nature of the tax preparation business, all four locations are essentially non-operational until the next "tax season."

Liberty Tax owes Agnant between $500,000 to $1 million in tax preparation fees for services the franchised locations provided in 2021 and 2022.[13]  Liberty Tax is withholding this amount because Agnant and Demetress have not complied with its demands to comply with the post-termination requirements of the Franchise Agreements, which are now the subject of the preliminary and final relief it seeks from this Court.  Agnant and Demetress allege that on or about March 12, 2022, Liberty Tax's representatives entered Agnant's offices and advised the employees that, if the leases and keys to the stores were not turned over, "it would be a much longer process for [Agnant and Demetress] to recover the tax preparation fees that [they] are owed."[14]  (Agnant Compl., Dkt. 14-1, Ex. 1, ¶ 55.)  Counsel for Liberty Tax confirmed at the show-cause hearing that Liberty Tax has the practice of withholding amounts owed to franchisees until Liberty Tax's claims are resolved and that a franchisee can bring a breach of contract claim if it wishes to challenge that conduct and obtain the owed funds.

---

[13] At the show-cause hearing, Agnant maintained that the amount owed was around $1 million, while Liberty Tax's counsel represented that it was approximately $500,000.  The Court does not have sufficient evidence to determine the exact amount owed, nor is it material to the pending motion for preliminary relief.

[14] Agnant and Demetress also allege that Liberty Tax representatives told their employees to surrender the stores because they had prepared fraudulent tax returns, and that the stores were "blacklisted" by the DOJ, and once blacklisted, could not be removed from such list in the future. (Agnant Compl., Dkt. 14-1, Ex. 1, ¶¶ 50, 52.)  However, it is Liberty Tax that blacklists stores and preparers, not the DOJ, and blacklisted stores can be removed from the list.  (*Id.* ¶¶ 51, 53.)

## II.      Procedural History

On April 25, 2022, Agnant and Demetress filed a complaint against Liberty Tax and  XYZ

Corporations I-X (entities who have owned, been owned by, been affiliated with, or are agents of

Liberty Tax), alleging violation of the New York Franchise Sales Act, fraud in the inducement,

and unjust enrichment.  (Agnant Compl., Dkt. 14-1, Ex. 1, ¶¶ 61–79.)  Agnant and Demetress

alleged that, using the DOJ investigation and the subsequent consent decree, Liberty Tax "has been

terminating, in the mass, contracts with its franchisees without fair or even nominal

compensation."  (*Id.* ¶¶ 57–59.)  Specifically with respect to the Franchise Agreements, Agnant

and Demetress alleged, among other things, that they did not violate any laws or the Franchise

Agreements, and that Liberty Tax fraudulently induced Agnant to purchase the franchises by

failing to disclose information about the DOJ lawsuit and consent decree.  (*Id.* ¶¶ 40, 42–43, 61–

73.)  Agnant and Demetress sought $2.3 million in damages.  (*Id.* ¶¶ 20–21, 46.)

One day later, on April 26, 2022, Liberty Tax filed a complaint against Agnant and

Demetress, alleging breaches of the Franchise Agreements, violation of the Defend Trade Secrets

Act of 2016, trademark infringement pursuant to 15 U.S.C. § 1114(1), false designation and

misrepresentation of origin pursuant to 15 U.S.C. § 1125(a), trademark dilution pursuant to 15

U.S.C. § 1125(c), unjust enrichment, and common law conversion.  (Liberty Tax Compl., Dkt. 1,

¶¶ 41–123.)   Among other things, Liberty Tax alleges that, in violation of the Franchise

Agreements' post-termination requirements, Agnant and Demetress did not assign the franchised

location leases to it or abide by the other post-termination/non-compete terms of the Franchise

Agreements, and that Agnant and Demetress improperly retained Liberty Tax's operations manual,

files, and information, which are confidential and contain trade secrets.  (*Id.* ¶¶ 32–41.)  Liberty

Tax seeks preliminary and permanent injunctive relief, and an unspecified amount of damages.

(*Id.* at 18–19.)

In conjunction with the filing of its Complaint, Liberty Tax filed a motion seeking temporary and preliminary injunctive relief against Agnant and Demetress. (*See* Liberty Tax's Motion for a Temporary Restraining Order and Preliminary Injunction ("Liberty Tax Mot."), Dkt. 2.) On May 2, 2022, the Court issued a temporary restraining order, requiring Agnant and Demetress to comply with the post-termination requirements of the Franchise Agreements, and set a date for a show-cause hearing. (*See* 5/2/2022 Docket Order; TRO Order, Dkt. 8.) On May 9, 2022, Agnant and Demetress filed an opposition to Liberty Tax's motion (*see* Agnant and Demetress Memorandum in Opposition ("Agnant Opp."), Dkt. 14), and on May 11, 2022, Liberty Tax filed a reply (*see* Liberty Tax Reply in Support of Motion ("Liberty Tax Reply"), Dkt. 15), accompanied by a declaration from David Dulaney, Liberty Tax's Vice President Compliance Counsel (*see* Dkt. 15-1).

On May 5, 2022, the Court consolidated the parties' dueling cases pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, designated Docket No. 22-CV-2385 as the lead case (because of the pending motion for preliminary relief), and closed Docket No. 22-CV-2352. (*See* 5/5/2022 Docket Order.)

The Court held a show-cause hearing on May 13, 2022. (*See* 5/13/2022 Minute Entry.) Liberty Tax relied entirely on its written submissions, which included declarations and documentary exhibits, to the Court to demonstrate its burden for a preliminary injunction. Agnant and Demetress relied on their papers and Agnant's testimony at the hearing. Agnant was questioned by the Court and her counsel, as well as cross-examined by Liberty Tax's counsel. After hearing the evidence and the parties' arguments, the Court reserved ruling and requested supplemental submissions from the parties. (*Id.*; 5/13/2022 Docket Order.) Accordingly, on May 14, 2022, Liberty Tax filed a letter attaching the full FDD it claims that it provided to Agnant prior

to November 2019 and a report and recommendation it referenced at the show-cause hearing, recently issued in the district court for the Middle District of Florida. (*See* Dkt. 16.) While the Court had not requested any other supporting documents and/or evidence, Liberty Tax also filed a supplemental declaration by Dulaney. (*See* Dkt. 18.) Agnant and Demetress filed a letter attaching communications with Liberty Tax demonstrating receipt of the amended full FDD in March 2021 and Agnant's attempts to cure issues identified by Liberty Tax before termination of the Franchise Agreements. (*See* Dkt. 17.)

## DISCUSSION

### I.  Legal Standard

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008)).  "A party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits . . .; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction."  *Khan's BBQ LLC*, 419 F. Supp. 3d 538, 552 (E.D.N.Y. 2019) (quoting *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015)); *see also Winter*, 555 U.S. at 20; *Salinger v. Colting*, 607 F.3d 68, 75 (2d Cir. 2010).  "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, . . . but to balance the equities as the litigation moves forward."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citations omitted); *see also Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) ("A preliminary injunction is an equitable remedy and an act of discretion by the court.").

"Courts refer to preliminary injunctions as [either] prohibitory or mandatory."  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018).  While a

"[p]rohibitory injunction[] maintain[s] the status quo pending resolution of the case[,] [a] mandatory injunction[] alter[s] it." *Id.* at 36–37 (citation omitted). The status quo in the context of a preliminary injunction is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (*per curiam*) (internal quotation and citation omitted). A party moving for a mandatory injunction, or an injunction that "will provide the movant with substantially all the relief sought and relief that cannot be undone even if the defendant prevails at a trial on the merits" must satisfy a heightened legal standard and both: "(1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal quotation and footnotes omitted).

The Court finds that Liberty is seeking a mandatory preliminary injunction because its preliminary injunction motion "requests relief identical to the relief sought in" its Complaint's demands for injunctive relief, *see Int'l Home Care Servs. of New York, LLC v. People's United Bank, Nat'l Ass'n*, 20-CV-3358 (PKC) (SJB), 2020 WL 5752187, at *4 (E.D.N.Y. Sept. 24, 2020), and would also alter the status quo, *see JTH Tax, LLC v. Shahabuddin*, 477 F. Supp. 3d 477, 485 (E.D. Va. 2020) ("[Liberty Tax and another plaintiff] request an injunction that alters the status quo, because they request that the court order [defendant] to transfer the leases to [them]. Therefore, [p]laintiffs seek a mandatory injunction, rather than a prohibitory injunction." (internal quotation marks omitted). (*See* Liberty Tax Complaint, Dkt. 1, at 19–20; Liberty Tax Motion, Dkt. 2, at ECF 3–4.) "The Court thus applies the 'heightened legal standard' appropriate for evaluating a mandatory preliminary injunction."[15] *Int'l Home Care Servs.*, 2020 WL 5752187, at

---

[15] However, "regardless of how the preliminary injunction is characterized, [Liberty Tax] has failed to make a showing of irreparable harm—a prerequisite to injunctive relief under the

*4 (quoting *N. Am. Soccer League, LLC*, 883 F.3d at 37); *see also Shahabuddin*, 477 F. Supp. 3d at 485.

## II.    Liberty Tax Has Not Demonstrated Irreparable Harm[16]

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered." *Elzanaty*, 929 F. Supp. 2d at 221 (alteration omitted) (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)). "[T]o show irreparable harm, the moving party must establish that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Int'l Home Care Servs.*, 2020 WL 5752187, at *4 (internal quotation marks omitted). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). The moving party must also demonstrate that irreparable harm is "actual and imminent, not remote or speculative." *Allstate Ins. Co.*, 929 F. Supp. 2d at 221.

---

legal standard for either a mandatory or prohibitory preliminary injunction." *Int'l Home Care Servs.*, 2020 WL 5752187, at *4 n.8.

[16] "[T]he moving party must show that injury is likely before the other requirements for an injunction will be considered." *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 221 (E.D.N.Y. 2013). Because the Court finds that Liberty Tax has not demonstrated irreparable harm, the Court "need not . . . resolve whether [Liberty Tax] has a high likelihood of succeeding on the merits, whether [Liberty Tax] has demonstrated a balance of hardships tipping decidedly in [its] favor, or whether the public interest would not be disserved by the granting of a preliminary injunction." *Int'l Home Care Servs.*, 2020 WL 5752187, at *6 n.14 (internal quotation marks omitted). However, as discussed *infra*, the Court further finds that, based on the evidence available at this stage of the proceeding, Liberty Tax has failed to demonstrate a likelihood of success with respect to the propriety of Liberty Tax's termination of the Franchise Agreements.

"[L]oss of reputation, good will, and business opportunities" may constitute irreparable harm. *Rex Med. L.P. v. Angiotech Pharm. (US) Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)). Good will is defined as the "expectancy of continued patronage[.]" *Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, No. 10-CV-8976 (RJH), 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x. 43 (2d Cir. 2012) (summary order); *see also Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07-CV-1562 (ERK) (RML), 2008 WL 207843, at *5 (E.D.N.Y. Jan. 24, 2008) (noting that good will "typically includes not only the likelihood that customers will return to the old place of business, but the competitive advantage of an established business"), *aff'd*, 282 F. App'x. 885 (2d Cir. 2008) (summary order). "[G]ood will constitutes the intangible qualities of a business that attract customers . . ." *Nat'l Elevator Cab & Door Corp.*, 2008 WL 207843, at *5. "[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Singas*, 2011 WL 497978, at *6 (internal quotation and citation omitted).

Here, because there is no evidence that Agnant and Demetress are continuing to operate as Liberty Tax or otherwise use its name, brand, or forms, Liberty Tax has failed to make a strong showing of irreparable harm as required for a mandatory preliminary injunction. *See Yang*, 960 F.3d at 128 (citation omitted). Nor has Liberty Tax met the standard threshold for irreparable harm. In support of its motion, Liberty Tax attached only the declaration of Roman Khaykin, a private investigator it retained to visit the former franchise locations post-termination. (*See* Dkt. 2-2.) While Khaykin recorded Agnant and Demetress's continued use of Liberty Tax's marks as of March 31, 2022, at the show-cause hearing, Agnant testified that she and Demetress had ceased using all of Liberty Tax's marks and forms, that they were now operating under the name "Rocket

Tax," and that there was new "Rocket Tax" signage at each of the previously Liberty Tax franchised locations.  Liberty Tax did not offer any contrary evidence at the show-cause hearing or in its post-hearing filings.  Thus, there is no evidence before the Court that trademark infringement is ongoing in this case.[17]

Accordingly, Liberty Tax's loss of goodwill and business opportunities, if any, would stem from Agnant and Demetress's retention and continued use of leases and phone numbers previously associated with Liberty Tax's franchises.[18]  Liberty Tax does not offer any evidence in support of its contention that Agnant and Demetress's continued use of the former franchise locations and phone numbers will cause Liberty Tax imminent and irreparable harm.  The two Dulaney declarations, submitted after Liberty Tax filed its motion, do not allege any irreparable harm.[19]  A different case brought by Liberty Tax against a franchisee, *JTH Tax LLC v. White*, No. 6-20-CV-140 (ADA), 2020 WL 3843691, at *1 (W.D. Tex. July 8, 2020), bears mention here.  There, Liberty Tax presented the Court with more evidence to support is claim of irreparable harm than it did here—including "a lone declaration of a regional manager in support of its argument" stating that

---

[17] Moreover, to the extent Liberty Tax claims injury to its goodwill due to Demetress's assumed-name filing for "Liberty Tax Service" with the New York Secretary of State, the Court finds that customers are highly unlikely to search for and access such filing and therefore highly unlikely to be confused by it.

[18] Liberty Tax also argues that Agnant and Demetress retained Liberty Tax's operations manual and client lists, but Agnant testified at the show-cause hearing that she was locked out of all of Liberty Tax's systems.  During cross-examination, counsel for Liberty Tax did not elicit any testimony from Agnant regarding the extent to which Agnant and Demetress still have access to any Liberty Tax documents, either electronically or physically.

[19] Even if the Dulaney declarations alleged irreparable harm, however, the Court would not consider them.  *See Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010) ("It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden.").

Liberty Tax would "suffer immeasurable harm." *Id.* at *5. The franchisee in that action argued that he was "not using or misusing any of Liberty's data and information and that he ha[d] been denied access to any such customer data and information" for a few months.[20] *Id.* The court found that to the extent Liberty Tax "endeavor[ed] to use" the defendant's "alleged access to Liberty's 'lucrative' data and information as evidence of irreparable harm, this argument [was] mooted [in part] by their own lockout of [d]efendant from their online systems." *Id.* Similarly here, Agnant testified—without challenge—to being locked out of Liberty Tax's systems and confirmed ceasing use of Liberty Tax's forms, thereby similarly "mooting" Liberty Tax's claim of irreparable harm.

Liberty Tax also argues that Agnant and Demetress's operation of competing tax preparation services at the former franchised locations will cause it permanent loss of customers and "permanently shut Liberty and any prospective franchisee out of the local tax preparation service market." (Memorandum in Support of Liberty Tax Motion ("Liberty Tax Mem."), Dkt. 2-1, at 11.) However, Liberty Tax offers no evidence to support this overblown claim. (*Cf.* Liberty Tax Compl., Dkt. 1, ¶ 9 ("Liberty [is] one of the largest tax franchisors in the United States. . . .").) Although Agnant testified at the show-cause hearing that Rocket Tax has, in fact, served former Liberty Tax customers and has also gained some new customers at the franchised locations since the termination of the Franchise Agreements, that is not enough to show irreparable harm. "When [Liberty Tax] terminated the [Franchise Agreements], it ended its relationship with the customers" at those locations. *Tutor Time Learning Centers, LLC v. KOG Industries, Inc.*, No. 12-CV-4129 (NGG) (RER), 2012 WL 5497943, at *4 (E.D.N.Y. Nov. 13, 2012). "At that point, these patrons

---

[20] Unlike here, however, the defendant admitted to the possession of Liberty Tax's operation manuals. *See White*, 2020 WL 3843691, at *5. Thus, the court in *White* granted Liberty Tax's preliminary injunction request in part and ordered the defendant to return the operations manual and customer information, as well as to stop using Liberty Tax's marks. *Id.* at *8.

were, for the foreseeable future, lost to" Liberty Tax. *Id.* Liberty Tax has not offered any evidence that it intended to immediately open a company store at or near those locations or that there are any "prospective franchisees" imminently seeking to enter those markets, and thus any harm it claims with respect to permanently losing "the local tax preparation service market" is speculative, at best. *See Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11–CV–325 (RJH), 2011 WL 1419612, at *5 (S.D.N.Y. Apr. 11, 2011) (finding the plaintiff's harm "speculative" because it "d[id] not state even a current intention to reenter the market [against the defendant], only a possibility that it may do so"); *cf. Carvel Corp. v. Eisenberg*, 692 F. Supp. 182, 186 (S.D.N.Y. 1988) (upholding a restrictive covenant because it protected the franchisor's "interest in protecting its know-how and . . . its ability to install another franchise in the same territory"). "Without proof of an expectancy of continued patronage, [Liberty Tax's] motion based on harm to its good will fails." *Tutor Time*, 2012 WL 5497943, at *5 (internal quotation marks and citation omitted).

In sum, Liberty Tax's showing of irreparable harm is "remote and speculative," rather than "actual and imminent" because Liberty Tax has "failed to demonstrate that any business losses [it] might suffer cannot be compensated with money damages when this case is finally resolved." *Int'l Home Care Servs.*, 2020 WL 5752187, at *4–5. If Agnant and Demetress's ongoing breach of the post-termination clauses has caused, or continues to cause, any lost customers and profits to Liberty Tax, these losses can be compensated with money damages. *See White*, 2020 WL 3843691, at *5. ("To the extent [Liberty Tax] argue[s] that [it] ha[s] or will lo[ose] customers as a result of [d]efendant's operation of a separate tax preparation service, the Court finds that [Liberty Tax has] failed to clearly show how such injury cannot be measured in monetary damages."). Indeed, Liberty Tax seeks money damages in Count Two of the Complaint for Agnant and Demetress's refusal to comply with any post-termination breaches of the Franchise

23

Agreements. (*See* Liberty Tax Compl., Dkt. 1, ¶¶ 62–71.) "This undercuts any argument that not transferring the leases [and phone numbers] at this juncture would result in irreparable harm."[21] *Shahabuddin*, 477 F. Supp. 3d at 485. "[A]ny injury that can be remedied in money damages is the antithesis of irreparable harm, and such a fact requires that the Court not find an irreparable injury." *Sunni, LLC v. Edible Arrangements, Inc.*, No. 14-CV-461 (KPF), 2014 WL 1226210, at *9 (S.D.N.Y. Mar. 25, 2014) (internal quotation marks omitted). As Agnant testified, she operated the franchised locations for over two years prior to the termination of the Franchise Agreements. Thus, any lost profits can be easily calculated from Agnant and Demetress's previous years' financial records, which Liberty Tax presumably possesses or can obtain through discovery. *See Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011). Liberty Tax has not proffered any evidence showing that it could not be compensated with money damages at the conclusion of this case, should it prevail.[22]

Even assuming that Liberty Tax presented sufficient evidence to demonstrate imminent irreparable harm, its request for a preliminary injunction would fail because it has not demonstrated a likelihood that it will succeed on one or more of its claims.

---

[21] Moreover, even if Liberty Tax offered evidence to support its contention of harm, there is little, if any, imminence to such harm. As Agnant testified at the show-cause hearing, the tax preparation season has concluded and the four stores at issue here are largely not in operation.

[22] Liberty Tax's argument that "[a]llowing a former franchisee to materially breach a franchise agreement during the height of tax season would itself deliver an irreparable blow to Liberty's good will and reputation" (Liberty Tax Mem., Dkt. 2-1, at 11–12), is conclusory and unpersuasive. Moreover, as the Court discusses further in its analysis of Liberty Tax's likelihood of success on the merits, while Agnant and Demetress may be in breach of the Franchise Agreements' post-termination clauses, the Court is not convinced that Liberty Tax properly terminated the Franchise Agreements in the first place.

III.     **Liberty Tax Has Not Demonstrated Likelihood of Success**

"To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent.'" *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)). "Further, Plaintiffs need not demonstrate a likelihood of success on the merits of every claim—rather, they need only 'show a likelihood of success on the merits of at least one of [their] claims.'" *725 Eatery Corp. v. City of N.Y.*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (quoting *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018)). However, "[i]t would be unfair to grant a [mandatory] preliminary injunction . . . to a franchisor who simply alleged, without much supporting evidence, that a franchisee had violated its franchise agreement and must be closed immediately." *Dunkin' Donuts Inc. v. Nat'l Donut Rests. of N.Y., Inc.*, 291 F. Supp. 2d 149, 152 (E.D.N.Y. 2003).

Although Liberty Tax provided the Court with two declarations from Dulaney, its Vice President Compliance Counsel, "pointing to violations of the franchise agreements that would justify [Liberty Tax's] termination of those agreements, [Agnant] has in turn produced strong rebuttal evidence and explanations that tend to neutralize [Liberty Tax's] assertions." *Id.* As discussed in detail in the Court's findings of fact, while Liberty Tax issued notices to Agnant regarding compliance with federal laws and regulations and the Franchise Agreements, Agnant consistently requested guidance on compliance, asking to speak to someone in Liberty Tax's compliance department and for specific, non-boilerplate instructions on how to correct the flagged income tax returns. Agnant testified that her team did attempt to satisfy Liberty Tax's notices to cure and supplement the filings to the extent possible, which is corroborated by records of communications presented in Agnant's supplemental submission. Agnant further testified that a Liberty Tax representative told her that the results of compliance reviews were dependent on who

the individual conducting the review was and his/her decisions regarding what to flag as insufficient—thus creating inconsistency in standards and outcomes, and compliance difficulty. Agnant also testified that Liberty Tax picked on "little things" when conducting its compliance reviews.  Coupled with Agnant's allegations that Liberty Tax is attempting to overtake franchisee stores by using the DOJ consent decree, without fair compensation to the franchisees, and the fact that Liberty Tax, in fact, is refusing to pay Agnant and Demetress at least $500,000 (if not $1 million) in tax preparation fees owed for services they provided in 2021 and 2022, the Court finds that Liberty Tax has failed to show at this stage a likelihood of success on any of its claims, because they are all premised on Liberty Tax's assertion that its termination of the Franchise Agreements was proper.[23]

---

[23] Judge Jack B. Weinstein observed the imbalance of power between franchisors and franchisees, and its potential for predatory terminations, over twenty years ago:

> Once the franchisee has invested time and resources in establishing a local market for the franchisor's goods or services, the franchisor can exercise its dominance by terminating the agreement either to open an outlet of its own or to create a new franchise relationship with a third party on more favorable terms to the franchisor. The franchisor is thus able to capitalize and exploit the local goodwill generated by the franchisee.  By contrast, the franchisee—particularly where an exclusive dealing agreement is involved—is often left with no means to recoup its investment in promoting the franchisor's products or services in the local market. . . .

> In order to equalize this potential power-imbalance and to protect local franchisees, a number of states have enacted franchise statutes. . . .  The first category protects the franc[h]isee at the time of the purchase of the franchise.  These laws generally require the disclosure of material information necessary for the franchisee to make an informed business decision.  The New York Franchise Act is an example. . . .

> Despite the fact that New York's statute does not by its express terms cover termination of franchises, its general tenor bespeaks a state policy to prevent overreaching in the franchise relationship.

*LaGuardia Assocs. v. Holiday Hospitality Franchising, Inc.*, 92 F. Supp. 2d 119, 125–27 (E.D.N.Y. 2000).  At this time, the Court does not determine whether the choice-of-law provision in the Franchise Agreements is effective or enforceable under New York law.

Agnant and Demetress argue that Liberty Tax cannot seek equitable relief with "unclean hands[,]" based on Liberty Tax's alleged failure to disclose to them the DOJ investigation, lawsuit, and consent decree against it, prior to the execution of the Franchise Agreements and the sale of the franchised locations.  (Agnant Opp., Dkt. 14, ECF 1, 3–4.)  "A court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith" related to the matter at issue.  *Cartier v. Symbolix, Inc.*, 386 F. Supp. 2d 354, 362 (S.D.N.Y. 2005) (internal quotation marks omitted).  "Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior."  *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999); *see also Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 461 (E.D.N.Y. 2008) ("[B]ecause trademark law also involves protecting the public's interests, courts typically only bar recovery under a theory of unclean hands when a plaintiff's conduct was egregious, or clear, unequivocal and convincing." (internal quotation marks and citations omitted)).  Agnant and Demetress have not met their burden of proof to assert a defense of unclean hands at this stage of the proceedings.  *Gidatex*, 82 F. Supp. 2d at 130.

However, that has no effect on the Court's finding that Liberty Tax has not met its burden of showing likelihood of success, which is based on Liberty Tax's inadequate showing regarding the propriety of terminating the Franchise Agreements.[24]  Liberty Tax argues that the Court should disregard any claims Agnant and Demetress have against it, asserting that "a franchisor's right to

---

[24] Or, under the non-heightened standard, "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *Donohue v Mangano*, 886 F. Supp. 2d 126, 149 (E.D.N.Y. 2012).  Given the Court's findings regarding irreparable harm and likelihood of success, the Court also finds that the balance of hardships does not tip in Liberty Tax's favor.

terminate a franchisee exists independently of any claims the franchisee might have against the franchisor." (Liberty Tax Reply, Dkt. 15, at 8 (collecting cases) (quoting *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992)).)  While the cases Liberty Tax cites to do stand for this general proposition and might apply to Agnant and Demetress's arguments, these cases also state that "[t]he franchisor has the power to terminate the relationship *where the terms of the franchise agreement are violated*."  *See, e.g.*, *Jiffy Lube*, 968 F.2d at 375–76 (emphasis added) (a franchisor is entitled to preliminary injunctive relief "if it can adduce sufficient facts indicating that its termination of [the franchisee's] franchises was proper.").  And in nearly all of the cases cited by Liberty Tax, courts found that the franchisor had valid grounds for terminating the franchise agreements.  *See, e.g.*, *JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 826 (E.D. Va. 2007) ("TH has also shown that Lee breached his obligations with JTH. . . .  JTH sent Lee a notice to cure on June 16, 2006, informing him that he owed money which was more than thirty days past due.  When Lee failed to pay, JTH properly terminated the Agreements on August 10, 2006."); *Midas Int'l Corp. v. T & M Unlimited, Inc.*, No. 00-CV-899E(F) (JTE), 2000 WL 1737946, at *4 (W.D.N.Y. Nov. 17, 2000) ("The agreement between Midas and T & M was clear – if T & M failed to make the required payments, Midas could terminate its franchise.  T & M failed to make the required payments . . . and Midas notified T & M that it was terminating the franchise according to their agreement."); *Dunkin' Donuts, Inc. v. Liu*, Nos. A. 99-CV-334, A. 00-CV-3666 (RFK), 2000 WL 1868386, *3 (E.D. Pa. Dec. 21, 2000) ("Defendants failed to make timely payments, Dunkin' gave them an opportunity to cure that default and Dunkin' appropriately terminated the Franchise Agreement.").  As already discussed, here, the Court is not convinced that Agnant and

28

Demetress did, in fact, breach the Franchise Agreements—which is the basis for the Court's finding that Liberty Tax has not shown a likelihood of success.[25]

Liberty Tax also argues that Agnant and Demetress only assert recission claims and that such claims were released in connection with the April 6, 2020 assignment from Agnant to Agnant and Demetress.  (*See* Liberty Tax Reply, Dkt. 15, at 6.)  Setting aside the issue of whether the release is valid and encompasses the claims being litigated here, the Court notes that, at the show-cause hearing, counsel for Agnant and Demetress also asserted improper termination arguments. Moreover, Agnant and Demetress have not yet filed an answer, or otherwise responded to, Liberty Tax's Complaint.[26]

## CONCLUSION

For the reasons stated herein, Liberty Tax's motion for a preliminary injunction is denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 17, 2022
      Brooklyn, New York

---

[25] The report and recommendation submitted by Liberty Tax is unpersuasive for the same reason—the court there made a finding of a pre-termination breach that warranted termination by Liberty Tax.  (*See* Report and Recommendation, *JTH Tax, LLC v. Gilbert*, No. 22-CV-625 (CEH) (AEP) (M.D. Fla. May 12, 2022), Dkt. 47 at 9–10.)

[26] Finally, to the extent the Court was the first to raise this issue, it is certainly entitled to do so, and that fact does not make the issue any less relevant or probative in determining whether to grant the sweeping mandatory preliminary injunction sought by Liberty Tax.